We'll hear argument first this morning in case 1296, Shelby County v. Holder. Mr. Rhyne? Mr. Chief Justice, and may it please the Court, almost four years ago, eight justices of the uniquely applicable to jurisdictions reached by Section 4B's antiquated coverage formula raised a serious constitutional question. Those justices recognized that the record before the Congress in 2005 made it unmistakable that the South had changed. They questioned whether current remedial needs justified the extraordinary federalism and cost burdens of preclearance. May I ask you a question? Assuming I accept your premise and there's some question about that, that some portions of the South have changed, your county pretty much hasn't. In the period we're talking about, it has many more discriminating — 240 discriminatory voting laws that were blocked by Section 5 objections. There were numerous remedied by Section 2 litigation. You may be the wrong party bringing this. Well, this is an on-face challenge, and I might say, Justice Sotomayor — Well, I don't agree with your premises, but let me just say, number one, when I said the South has changed, that is the statement that is made by the eight justices in the Northwest Austin case, and I certainly won't — Congress said that, too. Nobody — there isn't anybody in the Northwest Austin case who has said that the South has changed. There isn't anybody on any side of this issue who doesn't admit that huge progress has been made. Congress itself said that, but in line with Justice Sotomayor's question, in the D.C. Court of Appeals, the dissenting judge there, Judge Williams, said, if this case were about three states, Mississippi, Louisiana, and Alabama, those states have the worst records, and an application of Section 5 to them might be okay. Justice Ginsburg, Judge Williams said that as he assessed various measures in the record, he thought those states might be distinguished. He did not say, and he didn't reach the question, whether those states should be subject to preclearance, in other words, whether on an absolute basis there was sufficient record to subject them. But think about the state that you're representing. It's about a quarter black, but Alabama has no black statewide elected officials. If Congress were to write a formula that looked to the number of successful Section 2 suits per million residents, Alabama would be the number one state on the list. If you factor in unpublished Section 2 suits, Alabama would be the number two state on the list. If you use the number of Section 5 enforcement actions, Alabama would again be the number two state on the list. I mean, you're objecting to a formula, but under any formula that Congress could devise, it would capture Alabama. Well, if I might respond, because I think Justice Sotomayor had a similar question, and that is, why should this be approached on faith? Going back to Katzenbach and all of the cases that have addressed the Voting Rights Act preclearance and the formula, they've all been addressed to determine the validity of imposing preclearance under the circumstances then prevailing, and the formula. Because Shelby County is covered not by an independent determination of Congress with respect to Shelby County, but because it falls within the formula as part of the state of Alabama. So I don't think that there's any reluctance upon — But judicial challenges are generally disfavored in our law. And so the question becomes, why don't we strike down a formula, as Justice Kagan said, which under any circumstance, the record shows the remedy would be congruent, proportional, rational. Whatever standard of review we apply, its application to Alabama would happen. There are two separate questions. One is whether the formula needs to be addressed. In Northwest Austin, this Court addressed the formula. Circumstances there were a very small jurisdiction, as the Court said, approaching a very big question. Did the same in Rome, the city of Rome. It did the same in Katzenbach. So the formula itself is the reason why Shelby County encounters the burdens, and it is the reason why the Court needs to address it. Sotomayor. Sotomayor. I don't think that's a fair reading of Katzenbach. In Katzenbach, what the Court did was examine whether the formula was rational in practice and theory. And what the Court said is, while we don't have evidence on every jurisdiction that's reached by the formula, that by devising two criteria, one is rational and the other is theoretical, that the formula is rational and the theory is theoretical. And so the Court said, well, let's go back to the original formulation. Let's go back to the original formulation. The formula was rational, and the theory was theoretical. And so what the Court said is, while we don't have evidence on every jurisdiction that's reached by the formula, that by devising two criteria, one is rational and the other is theoretical. I could tell you that in Alabama, the number of legislators in the Alabama legislature are proportionate to the number of black voters. There's a very high registration and turnout of black voters in Alabama. But I don't think that that really addresses the issue of the rationality in theory and practice in the formula. If Congress wants to write another statute, another hypothetical statute, that would present a different case. But we're here facing a county, a state that are swept in by a formula that is neither rational in theory nor in practice. That's the hub. I suppose the thrust of the question so far has been, if you would be covered under any formula that most likely would be drawn, why are you injured under this one? Well, we don't agree that we would be covered under any formula. But that's the hypothesis of the Court. If you could be covered under most suggested formulas for this kind of statute, why are you injured by this one? I think that's the thrust of the question. Well, I think that if Congress has the power to look at jurisdictions like Shelby County individually and without regard to how they stand against other states, other counties, other states, in other words, what is the discrimination here among the jurisdictions, and after thoroughly considering each and every one, comes up with a list and says, this list gravely troubles us. That might present a vehicle for saying, this is a way to sort out the covered jurisdictions that's— Suppose Congress passed a law that said everyone whose last name begins with A shall pay a special tax of $1,000 a year. And let's say that tax is challenged by somebody whose last name begins with A. Would it be a defense to that challenge that, for some reason, this particular person really should pay a $1,000 penalty that people with a different last name do not pay? No, because that would just invent another statute. And this is all a debate as to whether somebody might invent a statute which has a formula that is rational in nature. I was about to ask a similar question. If someone is acquitted of a Federal crime, would it — would the prosecution be able to say, well, okay, he didn't commit this crime, but Congress could have enacted a different statute, which he would have violated in this case? Of course, you wouldn't listen to that, would you? No. I agree with you. The problem with those hypotheticals is obvious, but it starts from a predicate that the application has no basis in any record. But there's no question that Alabama was rightly included in the original Voting Rights Act. There's no challenge to the Reauthorization Act. The only question is whether a formula should be applied today. And the point is that the record is replete with evidence to show that you should. Well, I mean — It's not like there's some made-up reason for why the $1,000 is being applied to you or why a different crime is going to be charged against you. There's a real record as to what Alabama has done to earn its place on the list. Justice Sotomayor, with all respect, the question whether Alabama was properly placed under the Act in 1964 was — it was answered in Katzenbach because it came under a formula then deemed to be rational in theory and in practice. There's no independent determination by the Congress that Alabama singly should be covered. Congress has re-adopted the formula, and it is the formula that covers Alabama, and thus shall be. Now, the reason for the formula — of course, part of the formula looks back to what happened in 1965, and it says, are you a jurisdiction that did engage in testing and had low turnout or low registration? Now, that isn't true of Alabama today. That's correct. So when Congress, in fact, re-enacted this in 2005, it knew what it was doing was picking out Alabama. It understood it was picking out Alabama, even though the indicia are not — I mean, even though they're not engaging in that particular thing. But the underlying evil is the discrimination. So the closest analogy I could think of is imagine a state has a plant disease, and in 1965 you can recognize the presence of that disease, which is hard to find, by a certain kind of surface movement or plant growing up. Now, it's evolved. So by now, when we use that same formula, all we're doing is picking out that state. But we know one thing. The disease is still there in the state. Well, because this is a question of renewing a statute that, in fact, has worked. And so the question, I guess, is, is it rational to pick out at least some of those states? And to go back to Justice Sotomayor's question, as long as it's rational in at least some instances directly to pick out those states, at least one or two of them, then doesn't the statute survive a facial challenge? That's the question. Thank you. Justice Breyer, a couple of things are important. The Court said in Northwest Austin, and, Pina, you joined, current needs have to generate current burden. So what happened in 1965 in Alabama that Alabama itself had said was a disgrace doesn't justify a current burden. But this is then the question, does it justify? I mean, this isn't a question of rewriting the statute. This is a question of renewing a statute that, by and large, has worked. And if you have a statute that sunsets, you might say, I don't want it to sunset if it's worked, as long as the problem is still there to some degree. That's the question of rationality. Isn't that what happened? If you base it on the findings of 1965, I could take the decision in the city of Rome, which follows along that line. We had a huge problem at the first passage of the Voting Rights Act, and the Court was tolerant of Congress's decision that had not yet been cured. There were vestiges of discrimination. So when I look at those statistics today, and look at what Alabama has in terms of black registration and turnout, there's no resemblance. We're dealing with a completely changed situation through which, if you apply those metrics — And you said it a couple times this morning. Congress was well aware that registration was no longer the problem. This legislative record is replete with what they call second-generation devices. Congress said up front, we know that the registration is fine. That is no longer the problem. But the discrimination continues in other forms. Let me speak to that, because I think that that highlights one of the weaknesses here. On the one hand, Justice Breyer's questioning, well, could Congress just continue based on what it found in 1965 and renew? And I think your question shows it's a very different situation. Congress is not continuing its efforts initiated in 1975. So the reason Section 5 was created was because states were moving faster than litigation permitted to catch the new forms of discriminatory practices that were being developed. As the Court struck down one form, the states would find another. And basically, Justice Ginsburg calls it secondary. I don't know that I call anything secondary or primary. Discrimination is discrimination. And what Congress said is, it continues. Not in terms of voter numbers, but in terms of examples of other ways to disenfranchise voters. I think that's an example taken from one of the Section 2 and 5 cases from Alabama. I mean, I don't know what the difference is, except that this Court, or some may think, that secondary is not important. But the form of discrimination is still discrimination if Congress has found it to be so. When Congress is addressing a new evil, it needs then, and assuming it can find this evil, to a level justifying the extraordinary remedy. But that's not what is written in Section 5. It's said we can't keep up with the way states are doing it. I think we're dealing with two different questions. One is, was that kind of remedy, an unusual remedy, never before and never after invoked by the Congress, putting states into a prior restraint in the exercise of their core sovereign functions, was that justified? And in Katzenbach, the Court said, we're confronting an emergency in the country. We're confronting people who will not honor the 15th Amendment and who will use— Excuse me, 2006, Congress went back to the problem, developed a very substantial record, a 15,000-page legislative record, talked about what problems had been solved, talked about what problems had yet to be solved, and decided that, although the problem had changed, the problem was still evident enough that the Act should continue. It's hard to see how Congress could have developed a better and more thorough legislative record than it did, Mr. Ryan. Well, I'm not questioning whether Congress did its best. The question is whether what Congress found was adequate to invoke this unusual remedy. Indeed, Congress must have found that the situation was even clearer and the violations even more evident than originally, because originally the vote in the Senate, for example, was something like 79 to 18, and in the 2006 extension it was 98 to nothing. It must have been even clearer in 2006 that these states were violating the Constitution. Do you think that's true? No. Well, that's a good argument to me, Justice Scalia. It was clear to 98 senators, including every senator from a covered state, who decided that there was a continuing need for this piece of legislation. Or decided that perhaps they better not vote against it, that there's nothing, that there's none of their interests in voting against it. I don't know what they're thinking exactly, but it seems to me one might reasonably think this. It's an old disease. It's gotten a lot better, a lot better, but it's still there. So if you had a remedy that really helped it work, but it wasn't totally over, wouldn't you keep that remedy? Or would you not at least say that a person who wants to keep that remedy, which has worked for that old disease which is not yet dead, let's keep it going? Is that an irrational decision? That is a hypothetical that doesn't address what happened, because what happened is that the old disease, limiting people's right to register and vote, to have — No, I'm sorry. The old disease is discrimination under the Fourth, Fifteenth Amendment, which is abridging a person's right to vote because of color or race. But the focus of the Congress in 1965 and in Katzenbach, in 1964 and in Katzenbach, was on registration and voting preclusions. It's on voter dilution as well. It had already evolved away from that or started to. I beg your pardon, but I think, Justice Sotomayor, that this Court has never decided that the Fifteenth Amendment governs vote dilution. As I said, the Fourteenth Amendment does, but the original enactment was under the Fifteenth Amendment. Well, the Fifteenth Amendment says denial or abridgment. What would abridgment mean except for dilution? Well, abridgment might mean, for example, I let you vote in one election but not another. You know, for example, separate primary rules from election rules. Abridgment can be done in many ways. I think dilution is a different concept. We're not saying that dilution isn't covered by the Fourteenth Amendment, but I was responding to Justice Breyer in saying there is an old disease and that disease is cured. If you want to label disease and generalize it, you can say, well, the new disease is still a disease. I think that's not what happens. Some of the questions asked to this point I think mirror what the government says toward the end of its brief, page 48 and page 49. It's rather proud of this reverse engineering. We really knew it was some specific states we were interested in, and so we used these old categories to cover that state. Is that a methodology that, in your view, is appropriate under the test of congruence and proportionality? No, I think it is not. First of all, I don't accept that it was, quote, reverse engineered. I think it was just, as Justice Breyer indicated, continued because it was there. If you look at what was done and was approved in 1964, what Congress said, well, here are the problem areas that we detect. We've examined them in detail. We've identified the characteristics that would let somebody say, yes, that's where the discrimination is right. They're using a tester device. The turnout is below the national average by a substantial margin. That spells it out, and we have a relief valve and the then existing bailout, so it was all very rational. Here, you'd have to say, is the finding with respect to every state, Alaska, Arizona, the covered jurisdictions in New York City, is the designation of them congruent to the problem that you detect in each one? Even assuming, and we don't accept, that any of these problems require the kind of extraordinary relief, what's the congruence and what's the proportionality of this remedy to the violation you detect state by state? So merely saying it's reverse engineered, first of all, says, well, Congress really thought about it and said, we made up a list. It's in our heads, and gee whiz, look, this old formula miraculously covered the list. There's no record that that happened. Suppose there were, and suppose that's the rationale, because that's what I got from the government's brief and what I'm getting from some of the questions from the bank. What is wrong with that? If there was a record sufficient for each of those states to sacrifice their inherent core power to preclearance, to prior restraint, I think that you certainly could argue that, well, how Congress describes them, as long as it's rational, might work. But I don't think that we have that record here. And I don't know why you even go that far. I don't know why, under the equal footing doctrine, it would be proper to just single out states by name, and if that, in effect, is what is being done, that seems to me equally improper, but you don't seem to make that argument. Well, I think that... I did not think. I thought it was sort of extraordinary to say Congress can just pick out, we want to hit these eight states. It doesn't matter what formula we use, so long as we want to hit these eight states, that's good enough, and that makes it constitutional. I doubt that that's true. I agree with that. What I was saying is that Congress... Why? Why does Congress have to fix any problems? I would like to hear the answer to the question. The answer, Justice Kennedy, is Congress cannot arbitrarily pick out states. Congress has to treat each state with equal dignity. It has to examine all the states. The teaching of Katzenbach is that when Congress has done that kind of examination, it can devise a formula, even if it understands that that formula will not apply across all 50 states. So we accept Katzenbach, but in terms of just picking out states and saying I'm going to look at you and I'm going to look at you, no, that does not protect the equal dignity of the states. Well, Mr. Ryan, the formula that is applied right now, under that formula, covered jurisdictions, which have less than 25 percent of the nation's total population, they account for 56 percent of all successful published Section 2 lawsuits. If you do that on a per capita basis, the successful Section 2 lawsuits, it's four times higher in covered jurisdictions than in non-covered jurisdictions. So the formula, you can, you know, say maybe this district shouldn't be covered, maybe this one should be covered. The formula seems to be working pretty well in terms of going after the actual violations on the ground and who's committing them. There are two fallacies, Justice Kagan, in that statement. Number one is treating the covered jurisdictions as some kind of entity, a lump. Let us treat them. And as Judge Williams did in his dissent, if you look at them one by one, giving them their equal dignity, you won't. Well, all formulas are under-inclusive and all formulas are over-inclusive. Congress has developed this formula and has continued it in use that actually seems to work pretty well in targeting the places where there are the most successful Section 2 lawsuits, where there are the most violations on the ground that have been adjudicated. Well, if you look at the analysis state by state done by Judge Williams, that isn't true. Congress has picked out some states that fall at the top and some that do not. And there are other states like Illinois or Tennessee, and I don't think they deserve preclearance, that clearly have comparable records. And second, dividing by population may make it look better, but it is irrational. It is not only irrational when we object to it, but note that in the brief that Harris responded, they say it's irrational because, after all, that makes Delaware, a small state, look worse on the list of who are the primary violators. It's not a useful metric. It may make a nice number, but there's no justification for that metric. And it happens not to be the method that Congress selected. Correct. If they had selected that, you could say they used a rationale that works. But just because they picked some other rationale, which happens to produce this result, doesn't seem to me very persuasive. Your time is about ready to expire for the rebuttal period, but I do have this question. Can you tell me, it seems to me that the government can very easily bring a Section 2 suit and, as part of that, ask for bail in under Section 3. Are those expensive, time-consuming suits? Do we have anything in the record that tells us, or anything in the bar's experience that you could advise us? It's just an effective remedy. I mean, number one, it is effective. There are preliminary injunctions. It depends on the kind of dispute you have. Some of them are very complex. And it would be complex if somebody brought a — a State brought a Section 5 challenge in a three-judge court, saying the Attorney General has denied me preclearance. So it's the complexity of the question, not the nature of Section 2. And might I say, if you look at the Voting Rights Act, one thing that really stands out is you were up against States with entrenched discriminatory practices in their law. The remedy Congress put in place for those States was Section 2. And all across the country, we're talking about equal sovereignty. If there's a problem in Ohio, the remedy is Section 2. So if Congress thought that Section 2 was an inadequate remedy, it could look to the specifics of Section 2 and say maybe we ought to put timetables in there or modify it. But that's not what happened.  So I think that Section 2 covers even more broadly because it deals with results and which the Court has said is broader than effect. It's an effective remedy. And I think at this point, given the record, given the history, the right thing to do is go forward under Section 2 and remove the stigma of prior restraint and preclearance from the States and the unequal application based on data that has no better history than 1972. Ms. Bry, may I just remind, because something was said about equal footing, in Katzenbach, the Court said the doctrine of the equality of the States invoked by South Carolina does not bar this approach. For that doctrine applies only to the terms upon which States are admitted to the Union and not to the remedy for local evils which have subsequently appeared. That's what — has the Court changed that interpretation? I think that that referred — and Katzenbach, I'm familiar with that statement — it referred to the fact that once you use a formula, you're not — you're selecting out. The Court felt the formula was rational in theory and practice, and therefore it didn't, on its face, remove the equality of the States. They were all assessed under the same two criteria. Some passed, some did not. But I think that that really doesn't mask the need for equal treatment of the sovereign States. I'm going to have a hard time with that, because you can't be suggesting that the government sees a problem in one or more States and decides it's going to do something for them and not for others, like emergency relief, and that that somehow violates the equal footing doctrine. You can't treat States the same because their problems are different, their populations are different, their needs are different. Everything's different about the States. Well, I think when Congress uses the powers delegated under Article I, Section 8, it has substantial latitude in how it exercises power. We're talking about remedial power here. We're talking about overriding powers that are reserved to the States to correct abuse. When Congress does that, it has to treat them equally. It can't — Just tell me what you think is left of the rational means test in Katzenbach and the city of Rome. Do you think the city of Bourne now controls both 14 and — the 14th and the 15th Amendment and how we look at any case that arises under them? Justice Sotomayor, I think that the two tests have a lot in common because in the city of Bourne, the Katzenbach decision was pouring it out as a model of asking the questions that congruence and proportionality ask us to address. Number one, how does this remedy meet findings of constitutional violation? Got to ask that question. They asked that question in Katzenbach. What is the relation between the two? And then I think you have to ask the question, all right, you know, is this killing a fly with a swedge hammer a fair question? Because when you start to invade core functions of the States, I think that a great deal of caution and care is required. So I think that the rational basis test, McCulloch test, still applies to delegated powers. But here, on the one hand, the solicitor defends under the 14th and 15th Amendments saying, well, if something doesn't violate the 15th, it violates the 14th. And the Court's precedent under the 14th Amendment is very clear that the city of Bourne in congruence and proportionality test applies. The Court has applied it. But I don't think we wouldn't really need to get that far because we believe that if you examine it under McCulloch, just as they did in Katzenbach, it would fail as well. Fair enough. Further questions? Thank you, Counsel. Our questions have intruded on your rebuttal time, so we'll give you the five minutes and a commensurate increase in the General's time. General Borrelli? Thank you, Mr. Chief Justice, and may it please the Court. There's a fundamental point that needs to be made at the outset. Everyone acknowledges, petitioner, it's amici, this Court in northwest Austin, that the Voting Rights Act made a huge difference in transforming the culture of blatantly racist vote suppression that characterized parts of this country for a century. Section 5 preclearance was the principal engine of that progress, and it has always been true that only a tiny fraction of submissions under Section 5 result in objections. So that progress under Section 5 that follows from that has been as a result of the deterrence and the constraint Section 5 imposes on states and subjurisdictions and not on the actual enforcement by means of objection. And when Congress faced the question whether to reauthorize Section 5 in 2006, it had to decide whether it could be confident that the attitudes and behaviors in covered jurisdictions had changed enough that that very effective constraint and deterrence could be confidently removed. And Congress had, as Justice Kagan identified earlier, a very substantial record of continuing need before it. Can I ask you just a little bit about that record? Do you know how many submissions there were for preclearance to the Attorney General in 2005? I don't know the precise number, but many thousands. That's true. 3,700. Do you know how many objections the Attorney General lodged? There was one in that year. One. So one out of 3,700. But I think — but, Mr. Chief Justice, that is why I made the point a minute ago that the key way in which Section 5 — it has to be the case that everyone agrees that significant progress that we've made is principally because of Section 5 of the Voting Rights Act. And it has always been true that only a tiny fraction of submissions result in objections. And that will always be true forever into the future. You could always say, oh, there has been improvement, but the only reason there has been improvement are these extraordinary procedures that deny the states sovereign powers which the Constitution preserves to them. So, since the only reason it's improved is because of these procedures, we must continue those procedures in perpetuity. No. Is that the argument you're making? That is not the argument. We do not think that Congress — That's exactly the argument you were just making. It is not. Congress relied on far more than just the deterrent effect. There was a substantial record based on the number of objections, the types of objections, the findings of — That's a different argument. But they're related. They're related. Well, just to get — do you know which state has the worst ratio of white voter turnout to African-American voter turnout? I do not. Massachusetts. Do you know what has the best? Where African-American turnout actually exceeds white turnout? Mississippi. Yes, Mr. Chief Justice, but Congress recognized that expressly in the findings when it reauthorized the Act in 2006. It said that the first-generation problems had been largely dealt with, but their persistent — Which state has the greatest disparity in registration between white and African-American? I do not. Massachusetts. But third is Mississippi, where, again, the African-American registration rate is higher than the white registration rate. But when Congress — the choice Congress faced when it — Congress wasn't writing on a blank slate in 2006, Mr. Chief Justice. It faced a choice. And the choice was whether the conditions were such that it could confidently conclude that this deterrence and this constraint was no longer needed. And in view of the record of continuing need and in view of that history, which we acknowledge is not sufficient on its own to justify reenactment, but it's certainly relevant to the judgment Congress made because it justifies Congress having made a cautious choice in 2006 to keep the constraint and to keep the deterrence in place. There's no question that — Counsel, in the reauthorization — Justice Alito, there's no question that the Voting Rights Act has done enormous good. It's one of the most successful statutes that Congress passed during the 20th century, and one could probably go farther than that. But when Congress decided to reauthorize it in 2006, why wasn't it incumbent on Congress, under the congruence and proportionality standard, to make a new determination of coverage? Maybe the whole country should be covered, or maybe certain parts of the country should be covered based on a formula that is grounded in up-to-date statistics. But why wasn't that required by the congruence and proportionality standards? Suppose that Congress in 1965 had based the coverage formula on voting statistics from 1919, 46 years earlier. Do you think Katzenbach would have come out the same way? No, but what Congress did in 2006 was different than what Congress did in 1965. What Congress did — Congress in 2006 was not riding on a clean slate. The judgment had been made of what the coverage formula ought to be in 1965. This Court upheld it four separate times over the years. And it seems to me the question before Congress, under congruence and proportionality or the reasonably adapted test in McCulloch, whatever the test is, and under the formula in Northwest Austin, is whether the judgment to retain that geographic coverage bore a sufficient relation to the problem Congress was trying to target. And Congress did have before it very significant evidence about disproportionate results in Section 2 litigation in covered jurisdictions. And that, we submit, is a substantial basis for Congress to have made the judgment that the coverage formula should be kept in place, particularly given that it does have a bail-in mechanism and it does have a bail-out mechanism, which allows for tailoring over time. And that is reverse engineering that you seem so proud of. It seems to me that that obscures the real purpose of the statute. And if Congress is going to single out separate states by name, it should do it by name. If not, it should use criteria that are relevant to the existing. And Congress just didn't have the time or the energy to do this. It just reenacted it. I think the formula was rational and effective in 1965. The Court upheld it then. It upheld it three more times after that. Well, the Marshall Plan was very good, too, the Morrell Act of the Northwest Ordinance. But times changed. And the question is whether times had changed enough and whether the differential between the covered jurisdictions and the rest of the country had changed enough that Congress could confidently make the judgment that this was no longer needed. General Whirley, could you respond to the question that Justice Kennedy asked earlier, which was, well, why isn't Section 2 enough now? The government could bring Section 2 claims. It could assist private litigants who do. Why isn't — he asked if it was expensive. You heard the question. Yes. With respect to — start with Katzenbach. Katzenbach made the point that Section 2 litigation wasn't an effective substitute for Section 5 because what Section 5 does is shift the burden of inertia. And there's a — I think it is self-evident that Section 2 cannot do the work of Section 5. Take one example, polling place changes. That, in fact, is the most frequent type of Section 5 submission, polling place changes. Now, changes in the polling places at the last minute before an election can be a source of great mischief, closing polling places, moving them to inconvenient locations, et cetera. What Section 5 does is require those kinds of changes to be pre-cleared and on a 60-day calendar, which effectively prevents that kind of mischief. And there's no way in the world you could use Section 2 to effectively police — Well, that — I do think the evidence is very clear that Section — that individual suits under a Section 2 type of litigation were just insufficient and that Section 5 was utterly necessary in 1965, no doubt about that. And I think it remains — But with a modern understanding of the dangers of polling place changes, with prospective injunctions, with the preliminary injunctions, it's not — And with the fact that the government itself can commence these suits, it's not clear to me that there's that much difference in a Section 2 suit now and pre-clearance. I may be wrong about that. I don't have statistics for it. That's why we're — I don't — I don't really think that that conclusion follows. I think these under the — there are thousands and thousands of these under-the-radar screening changes to polling places and registration techniques, et cetera. And in most of those, I submit, Your Honor, the cost-benefit ratio is going to be even the cost of this litigation, which one of the reasons Katzenbach said Section 5 was necessary, is going to tilt strongly against bringing these suits. Even with respect to the big-ticket items, the big redistrictings, I think the logic Katzenbach holds in that those suits are extremely expensive and they typically result in after-the-fact litigation. Now, it is true, and the Petitioner has raised the notion that there could be a preliminary injunction, but I really think the Petitioner's argument that Section 2 is a satisfactory and complete substitute for Section 5 rests entirely on their ability to demonstrate that preliminary injunctions can do comparable work to what Section 5 does. They haven't made any effort to do that. And while I don't have statistics for you, I can tell you that the Civil Rights Division tells me that it's their understanding that in fewer than one quarter of ultimately successful Section 2 suits was there a preliminary injunction issued. So I don't think that there's a basis, certainly given the weighty question before this Court of the constitutionality of this law to the extent the argument is that Section 2 is a valid substitute for Section 5. I just don't think that the Petitioners have given the Court anything that allows the Court to reach that conclusion. And, of course, this is a concrete argument that Congress meets. Kennedy. Can you tell us how many attorneys and how many staff in the Justice Department are involved in the increased preclearance process? Is it 5 or 15? It's a very substantial number. And — Well, what does that mean? It means I don't know the exact number, Justice Kennedy. Hundreds? Dozens? What? I think it's dozens. And so the — and so it is — so it's a substantial number. It is true in theory that those people could be used to bring Section 2 litigation. But that doesn't answer the mail, I submit, because it's still — you're never going to get at all of these thousands of under-the-radar changes. And you're still going to be in the position where the question will be whether preliminary injunctions are available to do the job. There's no evidence that that's true. And I'll point out, there's a certain irony in the argument that what Petitioner wants is to substitute Section 2 litigation of that kind for the Section 5 process, which is much more efficient and much more — and much speedier, much more efficient, much more cost-effective. And why shouldn't it apply everywhere in the country? Well, because I think Congress made a reasonable judgment that the problem — that in 2006, that its prior judgments, that there was more of a risk in the covered jurisdictions, continued to be validated by the Section 2 record. But do you really think there was — that the record in 2006 supports the proposition that — let's — just let's take the question of changing the location of polling places. That's a bigger problem in Virginia than in Tennessee. Or it's a bigger problem in Arizona than Nevada. Or in the Bronx as opposed to Brooklyn. I think the combination of the history, which I concede is not dispositive, but is relevant because it suggests caution is in order, and that's a reasonable judgment on the part of Congress. The combination of that history and the fact that there is a very significant disproportion in successful Section 2 results in the covered jurisdictions, as compared to the rest of the country, that Congress was justified in concluding that there — that it — there was reason to think that there continued to be a serious enough differential problem. Well, the statistics that I have for me show that in, let's say, the five years prior to reauthorization, the gap between success in Section 2 suits in the covered and the non-covered jurisdiction narrowed and eventually was eliminated. Do you disagree with that? Well, I think that the — you have to look at it — Congress appropriately looked at it through a broader — in a broader timeframe, and it made judgments. And I think that actually the right way to look at it is not just the population judgment that Mr. Ryan was critical of, but the fact is — and I think this is in the Katz amicus brief — that the covered jurisdictions contain only 14 percent of the subjurisdictions in the nation, and so 14 percent of the subjurisdictions in the nation are generating up to 81 percent of the successful Section 2 litigation. General, is it — is it the government's submission that the citizens in the South are more racist than citizens in the North? It is not, and I do not know the answer to that, Your Honor, but I do think it was reasonable for Congress — For which you said it is not, and you don't know the answer to it. It's not our submission as an objective matter. I don't know the answer to that question. But what I do know is that Congress had before it evidence that there was a continuing need, based on Section 5 objections, based on the purpose-based character of those objections, based on the disparate Section 2 rate, based on the persistence of polarized voting, and based on a gigantic wealth of jurisdiction-specific anecdotal evidence that there was a continuing need — A need to do what? To maintain the deterrent and constraining effect of the Section 5 preclearance process in the covered jurisdictions, and that — And not impose it on everyone else. That's right, given the differential in Section 2 litigation. So what is your answer? I just want to be sure that I hear your answer to an allegation argument, an excellent argument, that's been made, or at least as I've picked up. And that is that, yes, the problem was terrible. It has gotten a lot better. It is not, to some degree, cured. All right? I think there's a kind of common ground. Now, then the question is, well, what about this statute that has a certain formula? One response is, yes, it has a formula that no longer has tremendous relevance in terms of its characteristic, that is, literacy test, but it still picked out nine states. So, so far you're with me. So it was rational when you continued a bill and, you know, you don't sunset it. You just keep it going. You're not held to quite the same criteria as if you were writing it in the first place. But it does treat states all the same that are somewhat different. One response to that is, well, this is the 15th Amendment, a special amendment, you know, added by. Maybe you're right. Then let's proceed state by state. Let's look at it state by state. That's what we normally do, not as a plot. All right. Now, I don't know how satisfactory that answer is. I want to know what your response is as to whether we should, if he's right, if he's right, that there is an irrationality involved, if you were writing it today, in treating state A, which is not too discriminatory, worse than apparently Massachusetts or something. All right. So if that's true, do we respond state by state, or is this a matter we should consider not as applied but on its face? I just want to hear what you think about that. Let me give two responses, Justice Breyer. The first is one that focuses on the practical operation of the law and the consequences that flow from it. I do not think that Shelby County or Alabama ought to be able to bring a successful facial challenge against this law on the basis that it ought not to have covered Arizona or Alaska. The statute has bailout mechanisms. Those jurisdictions can try to avail themselves of it. And if they do and it doesn't work, then they may very well have an as-applied challenge that they can bring to the law. But that doesn't justify, given the structure of the law and that there is a tailoring mechanism in it, it doesn't justify Alabama. I don't understand the distinction between facial and as-applied when you're talking about a formula. As applied to Shelby County, they are covered because of the formula. So they're challenging the formula as applied to them. And we've heard some discussion. I'm not even sure what your position is on the formula. Is the formula congruent and proportional today? Or do you have this reverse engineering argument? Congress's decision in 2006 to reenact the geographic coverage was congruent and proportional because Congress had— To the problem or to—or was the formula congruent and proportional? The Court has upheld the formula in four different applications. So the Court has found four different times that the formula was congruent and proportional. And the same kinds of problems that Mr. Ryan is identifying now were true even back in the city of Rome. Because, of course, the tests and devices were eliminated by the statute. So no jurisdiction could have tests and devices. And the city of Rome itself said that the registration problems had been very substantially ameliorated by then. But there were additional kinds of problems. The assent of the second-generation problems was true even in the city of Rome as a justification that made it congruent and proportional. And we submit that it's still true now. That Congress wasn't writing on a blank slate in 2006. Congress was making a judgment about whether this formula, which everyone agrees, and, in fact, Mr. Ryan's case depends on the proposition that Section 5 was a big success. Well, maybe it was making that judgment, Mr. Verrilli, but that's a problem that I have. Look, this Court doesn't like to get involved in racial questions such as this one. It's something that can be left to Congress. The problem here, however, is suggested by the comment I made earlier, that the initial enactment of this legislation in a time when the need for it was so much more abundantly clear, was in the Senate, it was double digits against it. And that was only a five-year term. Then it was reenacted five years later, again for a five-year term. Double digits against it in the Senate. Then it was reenacted for seven years. Single digits against it. Then enacted for 25 years. Eight Senate votes against it. And this last enactment, not a single vote in the Senate against it. And the House is pretty much the same. Now, I don't think that's attributable to the fact that it is so much clearer now that we need this. I think it is very likely attributable to a phenomenon that is called perpetuation of racial entitlement. It's been written about whenever a society adopts racial entitlements, it is very difficult to get out of them through the normal political processes. I don't think there is anything to be gained by any senator to vote against continuation of this act. And I am fairly confident it will be reenacted in perpetuity unless a court can say it does not comport with the Constitution. You have to show when you're treating different states differently that there's a good reason for it. That's the concern that those of us who have some questions about this statute have. It's a concern that this is not the kind of a question you can leave to Congress. There are certain districts in the House that are black districts by law just about now. And even the Virginia senators, they have no interest in voting against this. The state government is not their government. And they're going to lose votes if they do not reenact the Voting Rights Act. Even the name of it is wonderful, the Voting Rights Act. Who's going to vote against that in the future? You have an extra five minutes. Thank you. I may need it for that question. Justice Scalia, there are a number of things to say. First, we are talking about the enforcement power that the Constitution gives to the Congress to make these judgments, to ensure protection of fundamental rights. So this is a situation in which Congress is given a power which is expressly given to it to act upon the states in their sovereign capacity. And it cannot have been lost on the framers of the Fourteenth and the Fifteenth Amendments that the power Congress was conferring on them was likely to be exercised in a differential manner because it was — the power was conferred to deal with the problems in the former states of the Confederacy. So with respect to the constitutional grant of power, we do think it is a grant of power to Congress to make these judgments. Now, of course, subject to review by this Court under the standard of Northwest Austin, which we agree is an appropriate standard. That's the first point. The second point, as I do say, with all due respect, I think it would be extraordinary to look behind the judgment of Congress as expressed in the statutory findings and evaluate the judgment of Congress on the basis of that sort of motive analysis as opposed to — I'm not talking about dismissing it. I'm talking about looking at it to see whether it makes any sense. But I do think that the deference that Congress is owed, as City of Bernie said, much deference, Katzenbach said much deference, that deference is appropriate because of the nature of the power that's been conferred here and because, frankly, of the superior institutional competence of Congress to make these kinds of judgments. These are judgments that assess social conditions. These are predictive judgments about human behavior. And they're predictive judgments about social conditions and human behavior and about something that the people in Congress know the most about, which is voting and the political process. And I would also say, I understand your point about entrenchment, Justice Scalia, but certainly with respect to the Senate, he just can't say that it's in everybody's interest, that the enforcement of Section 5 is going to make it easier for some of those senators to win and it's going to make it harder for some of those senators to win. Again, they voted unanimously in favor of it. Do you think the preclearance device could be in action for the entire United States? I don't think there is a record that would substantiate that. And so that is because there is a federalism interest in each state being responsible to ensure that it has a political system that acts in a democratic and a civil and a decent and a proper and a constitutional way. And we agree with that. We respect that. We acknowledge that Northwest Austin requires an inquiry. If Alabama wants to have monuments to the heroes of the civil rights movement, if it wants to acknowledge the wrongs of its past, is it better off doing that if it's an own independent sovereign or if it's under the trusteeship of the United States government? Of course it would be better in the former situation. But with all due respect, Your Honor, everyone agrees that it was appropriate for Congress to have exercised this express constitutional authority when it did in 1965. And everybody agrees that it was the exercise of that authority that brought about a situation where we can now argue about whether it's still necessary. And the point, I think, is of fundamental importance here is that that history remains relevant. What Congress did was make a cautious choice in 2006 that, given the record before it and given the history, the more prudent course was to maintain the deterrent and constraining effect of Section 5, even given the federalism costs. Because, after all, what it protects is a right of fundamental importance that the Constitution gives Congress the express authority to protect through appropriate legislation. Before your time expires, I would like to make sure I understand your position on this as applied versus facial issue. Is it your position that this would be a different case if it were brought by, let's say, a county in Alaska as opposed to Shelby County, Alabama? No. Let me just try to articulate clearly what our position is. They've brought a facial challenge. We recognize that it's a facial challenge. We're defending it as a facial challenge. But our point is that the facial challenge can't succeed because they are able to point out that there may be some other jurisdictions that ought not to be appropriately covered. And that's especially true because there is a tailoring mechanism in the statute. And if the tailoring mechanism doesn't work, then jurisdictions that could make such a claim may well have an as-applied challenge. That's how we view it. Thank you, General. Thank you, Mr. Chief Justice. Mr. Algibale. Mr. Chief Justice, and may it please the Court, the extensive record supporting the renewal of the brief clearance provisions of the Voting Rights Act illustrates two essential points about the nature and continuing aspects of voting discrimination in the affected areas. The first speaks to this question of whether Section 2 is adequate standing alone. As our brief demonstrates, in Alabama and in many of the covered jurisdictions, Section 2 victories often need Section 5 to realize the benefits of the ruling in the Section 2 case. That is to say that these measures act in tandem to protect minority communities, and we've seen it in a number of cases. But that's true in every state, isn't it? Justice Scalia? I mean, you know, I don't think anybody's contesting that it's more effective if you use Section 5. The issue is why just in these states. Fair enough. It's beyond a question of being true in any place. Our brief shows that specifically in the covered jurisdictions, there is a pattern, a demonstrated pattern, of Section 2 and 5 being used in tandem, whereas in other jurisdictions, most of the Section 2 cases are one-off examples. We point to a whole number of examples. Take, for example, Selma, Alabama. Selma, Alabama in the 1990s, not in the 1960s, but in the 1990s, had a series of objections and Section 2 activity and observers, all that were necessary to continue to give effect to the minority inclusion principle that Section 5 was passed to vindicate in 1965. But a Section 2 case can, in effect, have an order for bail-in, correct me if I'm wrong, under Section 3, and then you basically have something that replicates Section 5. Bail-in is available. Bail-in is available if there's an actual finding of a constitutional violation. It has been used in a number of circumstances. The United States brief has an appendix that points to those. One of the recent ones was in Fort Chester, New York, if memory serves. But it's quite clear that the pattern in the covered jurisdictions is such that the repetitive nature of discrimination in those places, take, for example, the case in Lulac. After this Court ruled that the redistricting plan, after the 2000 round of redistricting, bore the mark of intentional discrimination, in the remedial election, the state of Texas tried to shorten and constrain the early voting period for purposes of denying the Latino community of the opportunity to have the benefits of the ruling. What we've seen in Section 2 cases is that the benefits of discrimination vest in incumbents who would not be there but for the discriminatory plan. And Congress, and specifically in the House report, I believe it's page 57, found that Section 2 continues to be an inadequate remedy to address the problem of these successive violations. Another example that makes this point very clearly is in the 1990s in Mississippi. There was an important Section 2 case brought finally after 100 years to break down the dual registration system that had a discriminatory purpose. When Mississippi went to implement the National Voter Registration Act, it tried to bring back dual registration, and it was Section 5 enforcement action that was able to knock it down. Do you agree with the reverse engineering argument that the United States has made today? I would frame it slightly differently, Chief Justice Roberts. My understanding is that the history bears some importance in the context of the reauthorizations, but that Congress in none of the reauthorizations stopped with the historical backward look. It takes cognizance of the experience, but it also looks to see what the experience has been on the ground. And what Congress saw in 2006 is that there was a surprisingly high number of continuing objections after the 1982 reauthorization period. I guess the question is whether or not that disparity is sufficient to justify the differential treatment under Section 5. Once you take away the formula, if you think it has to be reverse engineered and not simply justified on its own, then it seems to me you have a much harder test to justify the differential treatment under Section 5. This Court in Northwest Austin said that it needs to be sufficiently related, and I think there are two principal sources of evidence.  Indeed. Indeed. I don't understand those things to be unrelated. I think that they're part of the same test, same evaluative mechanism. The idea is, is Congress — the first question is, is Congress remedying something or is it creating a new right? That's essentially what Bernie is getting to. Is Congress trying to go do an end-around, a back-door way to expand the Constitution? We know in this area Congress is trying to implement the 15th Amendment, and the history tells us something about that. But specifically to the question — Well, the 15th Amendment is limited to intentional discrimination. And, of course, the preclearance requirement is not so limited, right? That's correct. But this Court's cases have held that Congress, in proper exercise of its remedial powers, can reach beyond the core of the intentional discrimination with prophylactic effect when they have demonstrated that a substantial problem exists. The two things that speak to this issue about the disparity in coverage and continuing to cover these jurisdictions, there are two major inputs. The first is the Section 5 activity. The Section 5 activity shows that the problem persists. It's a range of different obstacles, and Section 5 was passed to reach the next discriminatory thing. The case — Section 5 — the Section 5 activity may show that there's a problem in the jurisdictions covered by Section 5, but it says nothing about the presence or absence of similar problems in non-covered jurisdictions. Isn't that right? Absolutely, Justice Alito. And so I come to my second category. The second category, of course, is the piece of the Voting Rights Act that has national application, Section 2. And what the evidence in this case shows, and it was before Congress, is that the concentration of Section 2 successes in the covered jurisdictions is substantially more. Justice Kagan said that it was four times more, adjusting for population data. The fact of the matter is that there is another piece of evidence in the record in this case where Peyton McCrary looks at all of the Section 2 cases, and what he shows is that the directional sense that the Ellen Katz study pointed to dramatically understates the disparity under Section 2. And so he found that 81 percent — All of the non-covered states are worse in that regard than the non-covered states. Is that correct? Justice Scalia — Every one of them is worse. Justice Scalia, it's a fair question, and I was speaking to the aggregate. Not just a fair one. It's a crucial question. Congress has selected these nine states. Now, is there some good reason for selecting these nine? What we see in the evidence is that of the top eight states with favorable Section 2 outcomes, seven of them are the covered jurisdictions. The eighth was bailed in under the other part of the mechanism that, as Justice Kennedy points out, can bring in some jurisdictions that have special problems in voting. And so we think that that points to the fact that this is not a static statute. It's a statute that is — Yeah, but his point — I think the point is this. If you draw a red line around the states that are in, at least some of those states have a better record than some of the states that are out. So in 1965, well, we have history. We have 200 years or perhaps of slavery. We have 80 years or so of legal segregation. We've had 41 years of this statute, and this statute has helped a lot. So therefore, Congress in 2005 looks back and says, don't change horses in the middle of the stream because we still have a ways to go. Now, the question is, is it rational to do that? And people could differ on that. And one thing to say is, of course this is aimed at states. What do you think the Civil War was about? Of course it was aimed at treating some states differently than others. And at some point, that historical and practical sunset, no sunset, renew what worked type justification runs out. And the question, I think, is has it run out now? And now you tell me, when does it run out? What is the standard for when it runs out? Never? That's something you've heard people worried about. Does it never run out? Or does it run out but not yet? Or do we have a clear case where at least it doesn't run out now? Now, I'd like you to address that. Fair enough, Justice Breyer. I think that what the evidence shows before Congress is that it hasn't run out yet. The whole purpose of this act is that we make progress, and Congress recognized the progress that we made. And, for example, they took away the examiner provision, which was designed to address the registration problem. In terms of when we're there, I think it will be some point in the future. Our great hope is that by the end of this next reauthorization, we won't be there. Indeed, there's an overlook provision that says in 15 years, which is now nine years from where I stand here today before you, Congress should go back and look and see if it's still necessary. So we don't think that this needs to be there in perpetuity. But based on the record, in a 2011 case in which a federal judge in Alabama cited this court's opinion in Northwest Austin, there were legislators that sit today that were caught on tape referring to African American voters as illiterates. Their peers were referring to them as aborigines. And the judge citing the Northwest Austin case, it's the McGregor case cited in our brief, said that yes, the South has changed and made progress, but some things remain stubbornly the same, and the trained effort to deny African American voters the franchise is part of Alabama's history to this very day. Have there been egregious episodes of the kind you're talking about in states that are not covered? Absolutely, Chief Justice Roberts. Well, then it doesn't seem to help you make the point that the differential treatment between covered and non-covered continues to be justified. But the great weight of evidence, I think that it's fair to look at, on some level you have to look piece by piece, state by state, but you also have to step back and look at the great mosaic. This statute is in part about our march through history to keep promises that our Constitution says for too long were unmet. And this Court and Congress have both taken these promises seriously in light of the substantial evidence that was adduced by Congress. It is reasonable for Congress to make the decision that we need to stay the course so that we can turn the corner. To be fair, this statute cannot go on forever, but our experience teaches that six amendments to the Constitution have had to be passed to ensure safeguards for the right to vote, and there are many federal laws. They protect uniform voters, some protect eligible voters who have not had the opportunity yet to register, but together these protections are important because our right to vote is what the United States Constitution is about. Thank you, counsel. Mr. Ryan, five minutes. Thank you. Thank you, Mr. Chief Justice. Do you think that the right to vote is a racial entitlement in Section 5? Section 15th Amendment protects the right of all to vote. I asked a different question. Do you think Section 5 was voted for because it was a racial entitlement? Well, Congress... May I say Congress was reacting in 1964 to a problem of race discrimination which it thought was prevalent in certain jurisdictions. So to that extent, as the intervener said, yes, it was intended to protect those who had been discriminated against. If I might say, I think that Justice Breyer... Do you think that racial discrimination in voting has ended, that there is none anywhere? I think the world is not perfect. We're not arguing perfectibility. We're saying that there's no evidence that the jurisdictions that are called out by the formula are the places which are uniquely subject to that kind of problem. You've been on some statistics that Alabama hasn't, but there are others that are very compelling that it has. Why should we make the judgment and not Congress about the types and forms of discrimination and the need to remedy them? May I answer that? Number one, we're not looking at Alabama in isolation. We're looking at Alabama relative to other sovereign states. And coming to Justice Kennedy's point, the question is, has Alabama, even in isolation, and those other states, reached the point where they ought to be given a chance, subject to Section 2, subject to cases brought directly under the 15th Amendment to exercise their sovereign... How many other states have 240 successful Section 2 and Section 5? Again, Justice Sotomayor, I could parse statistics, but we're not here to try Alabama or Massachusetts or any other state. The question is the validity of the formula. That's what brings Alabama in. If you look at Alabama, it has a number of black legislators proportioned to the black population of Alabama. It hasn't had a Section 5 rejection in a long period. I want to come to Justice Greyer's point, because I think he's on a somewhat different wavelength, which is, isn't this a mere continuation? Shouldn't the fact that we had it before mean, well, let's just try a little bit more until somebody is satisfied that the problem is cured? And I... I said, no, don't change horses. You renew what's in the past... Right. ...where it works, as long as the problem isn't solved. Well... Okay. And I think the problem to which the Voting Rights Act was addressed is solved. You look at the registration. You look at the voting. That problem is solved on an absolute as well as a relative basis. So that's like saying, if I detect that there's a disease afoot in the population in 1965 and I have a treatment, a radical treatment that may help cure that disease, when it comes to 2005 and I see a new disease, or I think the old disease is gone, there's a new one, why not apply the old treatment? Well, Mr. Klein, that is the question, isn't it? You said the problem has been solved. But who gets to make that judgment, really? Is it you? Is it the court? Or is it Congress? Well, it is certainly not me. That's a good answer. I was hoping you'd say that. But I think the question is Congress can examine it. Congress makes a record. It is up to the court to determine whether the problem indeed has been solved and whether the new problem, if there is one... Well, that's a big new power that you're giving us, that we have the power now to decide whether racial discrimination has been solved. I did not think that that fell within our bailiwick. I did not claim that power, Justice Kagan. What I said is, based on the record made by the Congress, you have the power and certainly was recognized in Northwest Austin to determine whether that record justifies the discrimination among... There is this difference, which I think is a key difference. You refer to the problem as the problem identified by the tool for picking out the states, which was literacy tests, et cetera. But I suspect the problem was the denial or abridgment by a state of the right to vote on the basis of race and color. And that test was a way of picking out places where that problem existed. Now, if my version of the problem is the problem, it certainly is not solved. If your version of the problem, literacy tests, is the problem, well, you have a much stronger case. So how, in your opinion, do we decide what was the problem that Congress was addressing in the Voting Rights Act? I think you look at Katzenbach and you look at the evidence within the four corners of the Voting Rights Act. It responds to limited registration and voting as measured and the use of devices. The devices are gone. That problem has been resolved by the Congress definitively. So it can't be the basis of further legislation. I think what we're talking about here is that Congress looks and says, well, we did solve that problem, as everyone agrees. It's been very effective. Section 5 has done its work. People are registering voting and coming to Justice Scalia's point, Senators who see that a very large group in the population has politically wedded themselves to Section 5 are not going to vote against it. It will do them no good. And so I think Justice Scalia, that evidence, that everybody votes for it, would suggest some of the efficacy of Section 5. You have a different constituency from the constituency you had in 1964. But coming to the point, then, if you think there is discrimination, you have to examine that nationwide. They didn't look at some of the problems of dilution and the like because they would have found them all over the place in 1965, but they weren't responding to that. They were responding to an acute situation where people could not register and vote. There was intentional denial of the rights under the 15th Amendment. Thank you, Counsel. Thank you. Counsel, the case is submitted.